# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| NANCY BLANCHARD, | ) |
|     Plaintiff, | ) |
| v. | ) Civil Action No. 7:17-cv-00079 |
| SCOTT PRATER, *et al.*, | ) By: Elizabeth K. Dillon |
|     Defendants. | ) United States District Judge |

## MEMORANDUM OPINION

Plaintiff Nancy Blanchard brings this action against Scott Prater, an investigator for the Smyth County Sheriff's Office; Jonathan Tabor, Special Agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Doug Tuck, a deputy with the Wythe County Sheriff's Office; and Adam Williams, an investigator for the Wythe County Sheriff's Office.[1] Blanchard brought claims for defendants' alleged violation of her Fourth Amendment rights and for malicious prosecution.[2] The only claim that remains is plaintiff's claim that defendants violated her rights under the Fourth Amendment to be free from unreasonable search and seizure. This matter is before the court on two motions: 1) defendant Jonathan Tabor's motion for summary judgment; and 2) defendants Scott Prater, Doug Tuck, and Adam Williams's motion for summary judgment. The motions have been fully briefed and argued before the court. For the reasons set forth below, the court will grant both motions for summary judgment.

---

[1] Blanchard brings suit against defendants in their individual capacities. (Am. Compl. 2, Dkt. No. 31.)

[2] In an earlier opinion and order, the court dismissed a number of claims in the amended complaint. (Dkt. No. 62.) The court also denied Prater, Tuck, and Williams's motion to dismiss plaintiff's request for punitive damages. (Dkt. No. 62.)

## I. FACTUAL BACKGROUND

At the time of these allegations, Nancy and Robert Blanchard were married and living at the same residence in Rural Retreat, Virginia, although, according to plaintiff, they had separate entrances and living areas in the home. Ronnie and Wanda Compton[3] were staying at the home, and Jan Vannoy was staying on the property. (Blanchard Dep. 22–23, 28, 78, Dkt. No. 72-1; Vannoy Dep. 44:1–4, Dkt. No. 74-2.) At approximately 12:55 a.m. on January 9, 2014, and about one mile from the Blanchard residence, Wythe County Sheriff's Office (WCSO) deputies arrested plaintiff's husband, Robert Blanchard, who was in possession of guns and methamphetamine. (WCSO Incident Report, Dkt. No. 66-1.) Shortly after, around 1:00 to 2:00 a.m., the Comptons had an interaction with law enforcement. (Blanchard Dep. 126; Compton Dep. 50:8–14, Dkt. No. 75-1.) Plaintiff claims that police officers prohibited the Comptons from returning to plaintiff's residence, but plaintiff was not present for that conversation. (Blanchard Dep. 126, 137.) Rather, the Comptons, who were in a vehicle, were advised—but not compelled—by an unknown law enforcement officer to return home when they were in the vicinity of the Blanchard residence because the police had received a report of two gunshots and a man with a gun in the woods. (Compton Dep. 29:16–23, 33:11–23.)

Later that day, after learning about Mr. Blanchard's arrest, Williams called Prater to discuss the arrest and learned that a confidential informant had arranged to buy methamphetamine from "Bobby and Nancy" near the Blanchard residence on January 10, 2014. Williams and Prater believed that Bobby and Nancy referred to Mr. and Mrs. Blanchard. Williams then called Tabor because he believed there could be a connection between Mr. Blanchard's case and a case Tabor had been investigating about truck drivers transporting

---

[3] At the hearing on these motions, defense counsel notified the court that Wanda and Ronnie's last name is actually Compton. Earlier in the case, their last name was incorrectly identified as Sutphin.

methamphetamine. Prater and Tabor drove to the WCSO to assist Williams and see if they could learn information related to the truck drivers investigation. Tuck joined the other officers because he knew plaintiff from another case he worked on years ago. (Williams Dep. 28:8–29:1, 33:7–22, Dkt. No. 66-4; Prater Dep. 29:10–30:19, 36:12–37:5, Dkt. No. 66-5; Tabor Dep. 13:2–21, 17:15–22, 81:24–84:22, Dkt. No. 66-6, Tuck Dep. 10:7–13:2, 21:20–22:7, Dkt. No. 69-4.)

Prater, Tabor, and Tuck saw Williams preparing the affidavit for the search warrant for the Blanchard residence. The affidavit contained information from the confidential informant. They all saw Williams leave to request the search warrant from the magistrate judge. (Prater Dep. 36:19–37:13, 39:14–40:8, Dkt. No. 69-3; Tabor Dep. 17:1–14, 19:21–21:4, 85:11–22, Dkt. No. 69-6; Tuck Dep. 24:12–25:21.) At 11:42 a.m. on January 9, 2014, Williams presented his affidavit for a search warrant to the magistrate. (Search Warrant Affidavit, Dkt. No. 69-5.) Magistrate Whitlock issued the search warrant at 11:55 a.m. for 543 Red Apple Orchard Road, Rural Retreat, Virginia, the correct address.[4] (Search Warrant, Dkt. No. 69-7.) As depicted in the photo Williams used during his investigation, the warrant describes the home as "a single family dwelling with blue vinyl siding and blue shutters" with a "white uncovered porch," and includes "any and all outbuildings, vehicles and persons present during the execution of the search warrant." (Dkt. No. 69-8; Search Warrant.) Although Williams' affidavit correctly identified the suspect as Robert Charles Blanchard, the search warrant erroneously stated "Richard Charles Blanchard." (Search Warrant; Search Warrant Affidavit.)

Defendants met at the Virginia State Police Drug Task Force Office in Wytheville, about twenty to thirty minutes away from the Blanchard residence, before executing the search. Upon arrival at the Blanchard residence, Williams checked in with the WCSO dispatchers, and the

---

[4] The time of issuance is not in dispute.

officers secured the perimeter of the residence.[5] (Williams Dep. 59:1–10, 60:11–62:4, 81:22–82:6, Dkt. No. 69-2; Tabor Dep. 23:8–24:19, 26:24–27:3, 83:24–84:17, 85:23–86:5, Dkt. No. 69-6.) Defendants notified Mrs. Blanchard that they had a search warrant and entered her home.[6] Vannoy was at the residence at the time. (Williams 67:1–68:5, Dkt. No. 69-2; Tabor Dep. 27:23–28:7, Dkt. No. 66-6.) During the search, officers found methamphetamine, smoking devices, and guns. (Search Inventory & Return, Dkt. No. 66-10.)

Throughout the search, Mrs. Blanchard could not freely roam around the house, but she was not handcuffed, physically restrained, or arrested. (Williams Dep. 70:3–15, Dkt. No. 69-2.) As Williams and other officers searched the residence, WCSO investigator Denise Cook took pictures of items identified during the search.[7] (Cook Dep. 12:13–18, Dkt. No. 66-13.) Plaintiff stated that Tabor followed her around the house when she went inside to secure her dogs, asked for her consent to look through the numbers of her home telephone's caller ID, which she gave, told her to take a seat in the living room, and sat next to her until he left the residence. (Blanchard Dep. 74:5–13, 88:3–11, 134, Dkt. No. 72-1.) Tabor agrees that Mrs. Blanchard told him that he could look through the caller ID to see numbers Mr. Blanchard had dialed the night before. (Tabor Dep. 43:16–45:1, Dkt. No. 66-6.)

At some point during the search, Tabor asked to interview Vannoy and Mrs. Blanchard. Mrs. Blanchard agreed, and he conducted her interview in his government-issued vehicle with Prater present. Tabor did not handcuff Mrs. Blanchard and told her that she was not under arrest.

---

[5] The parties dispute when defendants arrived at the home and whether they had the search warrant upon arrival.

[6] The parties dispute when Mrs. Blanchard first saw the search warrant. Defendants claim that they presented it to her upon entry, while Mrs. Blanchard claims that an officer presented it to her hours after the search concluded. (*Compare* Tabor Mot. Summ. J. 7 *and* Prater, Tuck, & Williams Mot. Summ. J. 6 *with* Mem. Opp'n Tabor Mot. Summ. J. 7.)

[7] The parties also dispute when these photos were taken. (*See* Tabor Reply Supp. Mot. Summ. J. 3.)

4

(Blanchard Dep. 60, 74, Dkt. No. 72-1.) His interview focused on Mr. Blanchard because he was investigating his connection to the truck drivers transporting methamphetamine. Plaintiff claims that Prater read her *Miranda* rights to her during this interview. She went back inside with Tabor to the living room, he pulled the chair out for her, and sat with her for a little while. (Blanchard Dep. 62, Dkt. No. 72-1.) After being called a liar by officers other than defendants, she told Tabor that she wanted to see the search warrant and wanted a lawyer, so Tabor said he was not going to question her anymore, and he told Tuck that she wanted the warrant and a lawyer. (Blanchard Dep. 58, 74, Dkt. No. 72-1.) She remained in the living room until they left because they said to sit there while they finished the search and she thought that is what she was supposed to do. (Blanchard Dep. 74, Dkt. No. 72-1.) Tabor claims that Mrs. Blanchard only said she wanted a lawyer and that she would not answer any more questions. (Tabor Dep. 47:1–24, Dkt. No. 69-6.)

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). "[W]hen a court considers a summary judgment motion, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citations omitted). Parties may point to such facts by "citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.3d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

**B. The Search of the Home was Lawful and Pursuant to a Valid Search Warrant**

Plaintiff alleges that defendants violated her Fourth Amendment rights when they conducted a search of her home before they had a search warrant and with no exigent circumstances. Defendants contend that they had a valid search warrant prior to execution of the search.

The Fourth Amendment protects individuals "against unreasonable searches and seizures," guaranteeing their right "to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV. It is well-settled law that "a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). These exceptions "must be narrow and well-delineated in order to retain their constitutional character." *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam)). It

is generally unreasonable for police officers to enter an individual's home without consent, a warrant, or exigent circumstances to justify the intrusion. *See, e.g.*, *Steagald v. United States*, 451 U.S. 204, 211–12 (1981). Searches of the home are particularly significant, as "the Fourth Amendment has drawn a firm line at the entrance to the house," and "[a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980).

Based on these principles, the timing of the search here is critical. All parties agree that the search warrant was issued at 11:55 a.m. If the search was conducted after the warrant was issued, there is no violation. Otherwise, a violation occurred, given that no defendant argues there were exigent circumstances. In support of her position regarding timing, plaintiff relies on a speculative theory of an early-morning establishment of a perimeter around the house and on her own conflicting memories.

**1. Law Enforcement Interaction with the Comptons is Irrelevant to the Case**

Plaintiff theorizes that the police were setting up a perimeter around her house in the very early morning hours in order to conduct a search. In support of this theory, she relies on law enforcement's interaction with the Comptons. This interaction, however, in no way supports plaintiff's assertion that the search of her residence must have happened before the search warrant was issued. Indeed, there is nothing in the record connecting the two events.

As noted, Wanda Compton testified that she and her husband were in a car near the Blanchard residence the night before the search when a law enforcement official approached their vehicle. He told them they should leave the area for their own safety because there was a report of a man with a gun in the woods nearby and also a report of shots having been fired. She

7

agreed that this could have been around 1:00 a.m. on January 9. (Compton Dep. 49–50, Dkt. No. 80-2.)

Compton's testimony does not in any way suggest that the police were setting up a perimeter around the house at that time or that they were preparing to execute a search warrant, as plaintiff suggests. Nor is that a reasonable inference to ask a jury to draw. To the contrary, Wanda Compton clearly testified that the officer told them to leave the area because of the man running through the woods with a gun. (Compton Dep. 25:5–15, Dkt. No. 71-4). Thus, the incident involving the Comptons is not evidence that the police were setting up a perimeter in preparation for the search in those early morning hours and does nothing to advance plaintiff's theory of a morning search.

Plaintiff also tries to cobble together some meaningful connection between the Compton incident and the search supposedly occurring in the morning by highlighting Vannoy's testimony that the Comptons had said they were turned away twice from accessing the Blanchard residence. (Supp. Mem. Opp'n Tabor Mot. Summ. J. 1–4, Dkt. No. 80; Vannoy Dep. 64:23–65:21, Dkt. No. 80-3.) Vannoy's testimony about what the Comptons said is hearsay and is not competent summary judgment evidence. But even if it were admissible, Vannoy's testimony does not support plaintiff's theory of the timing of the search. Plaintiff seems to suggest that because the Comptons were turned away twice, the first time must have been that early morning incident described by Wanda Compton, and thus—her speculation goes—a perimeter was already being established at that time. However, Vannoy testified that Wanda Compton said the first time they were turned away was during the day and not "the night before or middle of the night." (Vannoy Dep. 64:23–65:21.) That portion of his testimony, then, actually supports the conclusion that any perimeter was being enforced during the daylight hours.

8

Additionally, plaintiff does not point to any evidence showing that the officers who interacted with the Comptons were the defendants or in any way associated with the defendants. All Wanda Compton could say was that it was a male in a brown uniform. (Compton Dep. 50:15–51:1, Dkt. No. 80-2.) In short, there is nothing other than wild speculation connecting any law enforcement interaction with the Comptons to a search perimeter. The theory simply provides no support for plaintiff's contention that her home was searched in the morning hours.

### 2. Plaintiff's Memories of the Time of the Search are Contradicted by Her Own Testimony, the Testimony of Others, and by Other Evidence

Again, the search warrant was issued at 11:55 a.m. Defendants agree that the search occurred in the afternoon.[8] Plaintiff testified that defendants arrived at her home, by convoy, between 9:00 and 9:30 a.m., Williams left between 10:00 and 10:30 a.m., and Tuck, Prater, and Tabor left between 1:00 and 1:30 p.m. on January 9. (Blanchard Dep. 55:23–57:16, Dkt. No. 72-1.) She asserts that a Wythe County Sheriff's Deputy came to her home at approximately 1:30 p.m. and gave her a copy of the search warrant and that this was the first time she saw it. (*Id.* at 66:13–67:19.) Despite her testimony, upon review of the evidence, the court finds that no reasonable jury could credit that testimony in light of all the evidence. It is clear that defendants searched the Blanchard residence pursuant to a valid search warrant, and there is no genuine dispute of material fact.

In *DiQuollo v. Prosperity Mortg. Corp.*, 984 F. Supp. 2d 563, 570 (E.D. Va. 2013), the court stated the relevant principle here: "The law is well established that uncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment." Fourth Circuit law is clear on this point—although credibility determinations are not made at the summary judgment stage, parties' differing beliefs about a

---

[8] Tabor asserts that he did not participate in the search of the residence, but, for purposes of this opinion, the court assumes that he did.

9

fact when the plaintiff solely relies on her own self-serving testimony cannot create a genuine dispute of material fact. *See Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012); *see also Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming the district court's granting of summary judgment in defendant's favor when "nothing in the record [supported] plaintiff's allegations other than plaintiff's own contradictory . . . testimony"). The key question is "whether the non-movant has produced enough evidence to demonstrate that a 'dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).

Plaintiff's testimony about her memory of the time of the search, and how she determined the time, is contradicted by her own testimony and the undisputed objective evidence in this case. Plaintiff testified that she was told to sit in the living room until all the defendants left and that they did not leave her home until around 1:00 or 1:30 p.m. (Blanchard Dep. 74:2–13.) Notably, her phone was one of the items that was seized. (Search Inventory & Return.) However, the data from her phone shows that she checked her bank account online and took pictures of her balance between 12:23 and 12:44 p.m. (Extraction Report, Dkt. No. 74-3.) If the timing were as she claims, she could not have accessed her phone between 12:23 and 12:44 p.m. Also, the officers acquired these bank balance photos, so they could not have seized her phone before 12:23 p.m. In addition, when asked to corroborate her timeline of when the search occurred, plaintiff stated that she called her son "right after [defendants] had left to let him know his father was in jail." (Blanchard Dep. 65:2–21, Dkt. No. 74-4.) However, her son's cellphone records show that she called him at 6:48 p.m., again contradicting her argument that defendants left between 1:00 and 1:30 p.m. (Nicholas Stroupe Celluar Records, Dkt. No. 74-5.)

10

Moreover, there are several reasons why plaintiff's testimony is insufficient to create a genuine dispute of material fact. Plaintiff's argument that the photos of items collected during the search were taken between 9:34 and 11:51 a.m. is unconvincing. (Mem. Opp'n Prater, Tuck, & Williams Mot. Summ. J. 8, 15–16.) When viewed in the "Apple preview program"—which is the program plaintiff relies on to argue when the photos were taken—the photos were created in 2000, which is clearly not accurate. (Dkt. No. 71-10.) Additionally, defendants' expert stated that the photos' internal metadata shows that they were taken between 1:34 and 3:52 p.m. on January 9. (DePue Report, Dkt. No. 66-17.) Defendants' expert opined that the metadata had not been altered (*id.* at 4), and WCSO's IT officer testified that no one in the Sherriff's office could have altered the photos' metadata (Bowers Dep. 22, Dkt. No. 69-19). Plaintiff provides no expert testimony to support her claim about the time when the photos were taken or contradicting defendants' expert. There is also direct evidence of the time from plaintiff's own clock. The search photos include a photo of a digital clock that shows 2:04 on its display, and the metadata for this photo shows that it was taken at 2:06 p.m. (Dkt. No. 69-18.)

Given the above, there is no genuine dispute that these photos were taken after the issuance of the search warrant and during the search. No reasonable jury could credit plaintiff's lay testimony, or her counsel's argument, about the timing of the photos from an Apple preview program, given the overwhelming and incontrovertible evidence, including expert testimony, contradicting it.

There is also a considerable amount of testimony to support finding that the search was executed after the search warrant was issued: (1) Tabor testified that he arrived at the WCSO at approximately 10:30 a.m. and that they left for the residence between 12:00 and 1:00 p.m., (Tabor Dep. 17:15–18:18, 69:22–70:10, Dkt. No. 66-6); (2) Cook testified that they arrived after

11

lunchtime and left around 6:00 p.m. (Cook Dep. 41:7–43:7); (3) Williams testified that their arrival time was documented when it was radioed into central dispatch, and, based on the warrant, that they arrived at 1:20 p.m. and that he left "right at dark," (Williams Dep. 81:10–82:2, 103:20–23, Dkt. No. 69-2); (4) Prater testified that when he arrived at the WCSO, before he went to the Blanchard residence, Williams "was trying to get the search warrant," and that he saw Williams come back to the WCSO with a search warrant from the magistrate before they executed the search warrant, (Prater Dep. 34:13–37:13, 46:12–47:18, Dkt. No. 69-3); (5) Tuck testified that it "was later on in the morning when . . . they started getting information on the search warrant and getting it together," and that Williams went to get the search warrant between 11:00 and 11:30 a.m., (Tuck Dep. 23:22–25:21, Dkt. No. 69-4); and (6) Vannoy (who was staying on the property) testified that he woke up in the morning when it was "starting to get daylight," and by the time defendants arrived to the home, he had drunk two pots of coffee, eaten breakfast, and had been working on the roof for "a couple hours,"[9] (Vannoy Dep. 44:9–22, 61:2–62:24, 67:8–24, Dkt. No. 74-2).

Finally, the documents related to the search also support an afternoon execution of the search warrant. The Virginia State Police Investigative Report states that the defendants' meeting at the Virginia State Police Drug Task Force Office occurred at approximately 12:00 p.m. and that the defendants executed the search warrant at 1:20 p.m. (Dkt. Nos. 69-9, 69-12), the WCSO dispatch record states that Williams arrived at 1:28 p.m. and left at 5:56 p.m. (Dkt. No. 66-11), the search inventory and return states that the search was executed at 1:20 p.m. (Search Inventory & Return), the ATF investigation report states that defendants executed the

---

[9] At the hearing, plaintiff argued that, based on Vannoy's recollection of the events before the search, defendants would have arrived to the Blanchard residence around 11:30 a.m. However, plaintiff's argument is not compelling. First, plaintiff's contention is that defendants arrived between 9:00 and 9:30 a.m., not at 11:30 a.m. Second, Vannoy testified that he considered 1:00 p.m. to still be morning, so the court cannot infer an 11:30 a.m. arrival from his testimony. (Vannoy Dep. 15:7–8.)

search warrant at 1:30 p.m. (Dkt. No. 66-9), and the narrative contained in the WCSO incident report states that the warrant was executed at 1:20 p.m. (Dkt. No. 66-12).

Plaintiff does not offer any evidence to genuinely dispute the overwhelming evidence that the search was executed in the afternoon, after the issuance of the search warrant. Rather, all she provides is uncorroborated, contradictory, self-serving testimony that is insufficient to create a genuine dispute of material fact. *See Harris*, 499 F. App'x at 294; *DiQuollo*, 984 F. Supp. 2d at 570. Because the search warrant was issued at 11:55 a.m. and no jury could find that the search was executed before its issuance, the court finds that there is no genuine dispute of material fact and that the search of the Blanchard residence was lawful.

**C. Defendants Did Not Unlawfully Seize Plaintiff**

Plaintiff was not unlawfully seized. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Florida v. Royer*, 460 U.S. 491, 512 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 16 (1968)). It is "[o]nly when freedom of movement is restrained by authority—only when a seizure occurs—[that] the Fourth Amendment and the probable cause requirement apply." *Craig v. Singletary*, 127 F.3d 1030, 1041 (11th Cir. 1997) (citing *United States v. Mendenhall*, 446 U.S. 544, 555 (1980)). A person has been seized under the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 545. "[I]n appropriate circumstances the Fourth Amendment allows a properly limited search or seizure on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime. But to justify such a seizure an officer must have a reasonable suspicion of criminal activity based on specific and articulable facts . . . [and] rational inferences from those facts." *Royer*, 460 U.S. at 512 (internal quotations and citations omitted).

Plaintiff was interviewed in Tabor's vehicle with Prater present. She agreed to be interviewed by Tabor, was not handcuffed, was free to decline Tabor's questions, and was told that she was not under arrest. Moreover, Tabor did not make physical contact with plaintiff, did not display any weapons, and his interview focused on Mr. Blanchard, not the plaintiff. (Blanchard Dep. 57, 60, 74; Williams Dep. 70; Tabor Dep. 36; Report of Investigation.) Even if Prater did read plaintiff her *Miranda* rights and plaintiff subjectively felt that she was not free to leave, there was no unlawful seizure here. Plaintiff voluntarily consented to the interview, and a reasonable person in plaintiff's position would not have believed that she was under arrest. *See Craig*, 127 F.3d at 1042–43 (finding that a reasonable person in the plaintiff's position would not believe he was under arrest when the plaintiff agreed to go to the police station with the officers, was not handcuffed, was told that he was not under arrest, and was read his *Miranda* rights), *United States v. Bowen*, 279 F. App'x 468, 469 (9th Cir. 2008) (finding that the plaintiff's voluntary consent would "purge the taint of any alleged illegal seizure"); *see also United States v. Redlightning*, 624 F.3d 1090, 1105 (9th Cir. 2010) ("[T]he issuance of *Miranda* warnings as a cautionary measure does not itself transform the situation into a Fourth Amendment seizure.") (citations omitted).

Also, to the extent plaintiff argues she was unlawfully seized because she "did not feel free to leave the property" (Mem. Opp'n Prater, Tuck, & Williams Mot. Summ. J. n.7, 11), the law is clear that this does not constitute an unlawful seizure. Officers executing a search warrant may "detain the occupants of the premises while a proper search is conducted," and need not "have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." *Bailey v. United States*, 568 U.S. 186, 193 (2013). It is therefore

inconsequential that plaintiff did not feel free to leave the property as the search warrant was executed.

Similarly, to the extent plaintiff implies that Tabor unlawfully seized her when he told her to sit in the living room and remained seated next to her until he left (Mem. Opp'n Tabor Mot. Summ. J. 6; Blanchard Dep. 72:5–21), for the reasons discussed above, this was also not an unlawful seizure. She was not handcuffed, she had been told she was not under arrest, Tabor did not make physical contact with her, and she consented by sitting down in the living room. Tabor did not consider her to be in custody. (Tabor Dep. 36:13–21.) Thus, plaintiff's interaction with Tabor in the living room was not an unlawful seizure.

For these reasons, plaintiff was not seized in violation of the Fourth Amendment, and there is no genuine dispute of material fact in that regard.

### III. CONCLUSION

For the foregoing reasons, the court will grant defendants' motions for summary judgment, and an appropriate order will be entered.

Entered: March 31, 2019.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge